UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMBAC ASSURANCE CORPORATION,

*Plaintiff,*

v.

DEUTSCHE BANK NATIONAL TRUST
COMPANY,

*Defendant.*

No.

**COMPLAINT**

Plaintiff Ambac Assurance Corporation ("Ambac"), by and through its attorneys

Patterson Belknap Webb & Tyler LLP, for its complaint against Defendant Deutsche Bank

National Trust Company ("DBNT"), Trustee of the Harborview Mortgage Loan Trust 2006-9

("Harborview 2006-9" or the "Trust"), alleges as follows:

### NATURE OF THE ACTION

1.      This action arises out of DBNT's duties as the Trustee of Harborview

2006-9, a residential mortgage-backed securities ("RMBS") trust backed by loans originated by

Countrywide Home Loans, Inc. ("Countrywide").  Because an event of default, as defined in the

Trust's governing documents, has occurred, DBNT as Trustee is obligated to conduct itself like a

prudent person managing his or her own affairs, and it owes fiduciary duties to Trust

beneficiaries, including Ambac.

2.      Harborview 2006-9, like many RMBS trusts, has suffered enormous losses

since it closed in 2006:  DBNT reports nearly $900 million in cumulative realized losses to date.

And, as in many other RMBS trusts, these losses would have been avoided if Countrywide and

its successor-in-interest Bank of America Corp. (together with its subsidiary Bank of America,

10473281

National Association, "Bank of America") had complied with their contractual obligations to remove loans from the Trust that breach representations and warranties, compensating the Trust by paying a make-whole "repurchase price." As reported in securities filings, DBNT demanded just that, issuing repurchase demands no later than March 31, 2012 for 1,719 loans in the Trust with collateral balance of over $490 million. Countrywide never repurchased the loans, and DBNT did nothing further to protect the Trust's interests. It did not investigate whether the remaining 5,000 loans in the Trust suffered from similar breaches, and it did not bring suit against Countrywide to protect the Trust's rights, despite Countrywide's blatant refusal to meet its contractual obligations and DBNT's express contractual duty to enforce the Trust's repurchase rights against Countrywide and its successors, including Bank of America.

      3.    These failings are all the more egregious because the Trust suffered from a contractually defined Event of Default by virtue of Countrywide's failure to abide by its repurchase obligations. Under the Trust's governing agreements, once an Event of Default has occurred, DBNT must exercise all of its rights and powers and manage the Trust as a prudent person would manage his or her own affairs. And under New York common law, which governs the Trust, upon an Event of Default DBNT took on obligations resembling those of an ordinary fiduciary and is required to act with undivided loyalty to the Trust and its beneficiaries to protect the value of the Trust's assets. Once an Event of Default had occurred, DBNT could no longer hide behind the contract's exculpatory provisions; it had to act. DBNT obtained a tolling agreement on the Trust's behalf on October 2, 2012, but, other than renewing the agreement from time to time, has done nothing to recover on the Trust's claims.

      4.    The result of DBNT's inaction was predictable. Emboldened by the lack of enforcement and a demonstrably feeble counterparty, Countrywide refused to repurchase any

10473281

loans from the Trust, including those that were the subject of the original 1,719 repurchase demands, which remain outstanding according to the most recent securities filings. In October 2017, a small group of certificateholders approached Countrywide and Bank of America and—without the knowledge of DBNT or any other Trust beneficiaries—offered to mediate the Trust's claims. Together, these certificateholders (who have since referred to themselves as the "Initiating Certificateholders") and Countrywide cooked up a Settlement Agreement under which the Trust would release all of its claims against Countrywide and its affiliates for a payment of $38 million—and a bonus of $1.14 million to be paid straight to the Initiating Certificateholders' attorneys. $38 million represents barely 4% of the losses suffered by the Trust, and indeed less than a tenth of the balance of the loans that were the subject of repurchase demands by 2012. The Initiating Certificateholders then presented the Settlement Agreement, signed by Countrywide, Bank of America, and the Initiating Certificateholders, to DBNT to sign on behalf of the Trust, purporting to bind not only DBNT itself but all of the other certificateholders and Trust beneficiaries.

5.      Included in the Settlement Agreement—which DBNT had no role in negotiating—were procedures designed by the Initiating Holders, Countrywide, and Bank of America to govern the process by which DBNT would accept or reject the Proposed Settlement. Under those procedures, if certificateholders representing 25% of the Voting Rights in the Trust (as defined in the PSA), excluding Voting Rights controlled by Countrywide or Bank of America affiliates, vote in favor the settlement, and no greater number of Voting Rights are exercised against it, DBNT will accept the Settlement Agreement by August 23, 2018. If fewer than 25% of Voting Rights support the Settlement Agreement, DBNT will accept if it receives court approval that it is "authorized" to accept the settlement. The Initiating Certificateholders have

contractually bound themselves to vote in favor of the Settlement Agreement, making one of these two methods of acceptance all but assured.

6.      Faced with such a paltry offer, resulting from a negotiation from which it was excluded, any prudent person and fiduciary would turn it down flat.  DBNT did no such thing.  Instead, it adopted the very approval procedures devised by Countrywide and Bank of America, and notified Trust beneficiaries that it intended to sign the Settlement Agreement if the specified conditions are met.

7.      DBNT's inaction in protecting the Trust's claims and beneficiaries has had catastrophic effects on Ambac.  Ambac is a financial guaranty insurer, sometimes called a "monoline" insurer, that issued a financial guarantee insurance policy (the "Policy") to the Trust for the benefit of certain classes of certificateholders.  Under the Policy, when the Trust suffers a shortfall in cashflows from the underlying mortgage loans that affects the insured certificates, Ambac will step in and make payments to the insured certificateholders.  Ambac has made millions of dollars of claims payments to the Trust to be distributed to holders of insured certificates.

8.      If DBNT had taken legal action against Countrywide or negotiated a reasonable settlement, the funds recovered would have been deposited in the Trust and, through the contractually established "waterfall" of payment priorities, reimbursed Ambac for past claims paid and, by creating a collateral cushion, avoided the need for future payments.  When DBNT instead accepts the Settlement Agreement of $38 million and releases the Trust's claims, *none* of the settlement amount will be distributed to Ambac, and the Trust's ability to make further claims against Countrywide and its affiliates will be released.

9.     Ambac files this action seeking a declaratory judgment that an Event of Default has occurred, and damages to compensate Ambac for DBNT's breach of its contractual and fiduciary duties, including by failing to enforce Countrywide's repurchase obligation, failing to give notice that an Event of Default had occurred, failing to investigate the breaches that pervaded the Trust, failing to bring suit against Countrywide, instituting a vote process inconsistent with its obligations, and accepting an unreasonably low settlement offer from Countrywide and Bank of America.

## PARTIES

10.     Defendant DBNT is a national banking association organized under the laws of the United States to carry out the business of a limited purpose trust company.  DBNT's main office and principal place of business are located in Los Angeles, California, and its principal place of trust administration is located in Santa Ana, California.

11.     DBNT is a wholly-owned subsidiary of Deutsche Bank Holdings, Inc., which is a wholly-owned subsidiary of Deutsche Bank Trust Corporation.  Deutsche Bank Trust Corporation is a subsidiary of Deutsche Bank AG.

12.     Plaintiff Ambac is a Wisconsin-domiciled stock insurance corporation authorized to transact surety and financial guaranty insurance.  Ambac maintains its principal place of business in New York, New York.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

14.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because DBNT conducts business in this District and a substantial part of the events and omissions giving rise to the claims asserted occurred in this District.

15.    This Court has personal jurisdiction over DBNT because DBNT regularly transacts or transacted business within the state and it engaged in purposeful conduct within the state by signing a contract that created a New York common law trust, governed by New York law, and by assuming the duties as Trustee of that New York trust.

## FACTUAL ALLEGATIONS

### I.    The Harborview 2006-9 Trust

16.    This action concerns Harborview 2006-9, an RMBS trust originally backed by approximately 6,827 first lien mortgage loans, all originated by Countrywide, with an aggregate principal balance of approximately $2.88 billion.  The loans are divided into two loan groups, Group 1 and Group 2.  RMBS certificates, including, on information and belief, Harborview 2006-9 certificates, regularly trade in New York and many certificateholders reside in New York.  DBNT is the Trustee of Harborview 2006-9.  Ambac issued the Policy covering the Class 2A-1C2 certificates (the "Insured Certificates").

17.    Like all RMBS transactions, Harborview 2006-9 aggregates a pool of mortgage loans and issues securities backed by the cashflows from those mortgage loans to investors, known as certificateholders.  By purchasing certificates issued by the Trust, certificateholders acquire rights to the cashflow generated by the payments made by mortgagors. Certificates are divided into classes or tranches, with each class of certificates entitled to a different payment priority.  To decrease the risk to certificateholders of a shortfall of mortgage payments to the trust, and therefore to make the certificates more marketable, some RMBS securitizations include a financial guaranty insurance policy.  Under such a policy, the certificate

10473281

insurer agrees, in exchange for premiums, to make specified payments of principal and interest to insured certificates in the event the cashflows from the underlying mortgage loans are insufficient.

18.     The credit quality and characteristics of the mortgage loans backing the Trust are therefore of the utmost importance to certificateholders and to Ambac as Certificate Insurer.  The quality of the mortgage loans depends on, among other factors, how the loans were originated, the underwriting guidelines used to approve the loans, the originator's compliance with those underwriting guidelines, the quality and value of the mortgaged properties, and compliance with applicable laws.  To assure the Trustee, Ambac, and investors of the quality and characteristics of the mortgage loans deposited in the securitization, Countrywide made dozens of representations and warranties about the mortgage loans, which DBNT as Trustee is responsible for enforcing.

19.     Harborview 2006-9 is governed by a series of interrelated contracts.  First, Countrywide, as seller and servicer, sold and assigned its interest in the mortgage loans to Greenwich Capital Financial Products, Inc. ("GCFP") pursuant to a Master Mortgage Loan Purchase and Servicing Agreement ("MMLPSA"), dated April 1, 2003, as amended on November 1, 2004.

20.     In section 7.02 of the MMLPSA, Countrywide made numerous representations and warranties about the loans being assigned (the "Loan-Level Warranties"), including that

- each loan was underwritten generally in accordance with Countrywide's underwriting guidelines in effect at the time of origination;

- no fraud was committed by Countrywide in the origination of the loans and, to the best of Countrywide's knowledge, no fraud was

10473281

committed by the borrower or any other person involved in the loans' origination;

- the origination practices used by Countrywide "have been in all respects legal, proper, prudent and customary" and Countrywide "ha[d] no knowledge of any circumstances [] or condition" with respect to the loan "that can reasonably be expected to cause the Mortgage Loan to become delinquent"; and

- the information contained in the Mortgage Loan Schedule was "complete, true and correct."

21.     The MMLPSA also sets forth the remedies for Countrywide's breach of any of its representations and warranties.  If Countrywide discovers or is given notice of a breach of a Loan-Level Warranty that materially and adversely affects the value of the related mortgage loan, and fails to correct or cure such breach within 90 days, Countrywide must repurchase the loan at the Repurchase Price specified in the MMLPSA.  MMLPSA § 7.03.

22.     To effectuate the Harborview 2006-9 transaction, GCFP conveyed a pool of loans acquired under the MMLPSA to Greenwich Capital Acceptance, Inc. (the "Depositor") through a Mortgage Loan Purchase Agreement ("MLPA") dated as of September 1, 2006.  The Depositor then conveyed the loans to the Trust through a Pooling and Servicing Agreement ("PSA") dated as of September 1, 2006 between the Depositor, GCFP and DBNT.  The PSA is governed by New York law.  PSA § 12.04.

23.     Countrywide's representations and warranties, as well as the right to enforce remedies for breach, were assigned to the Trustee for the benefit of the Trust through the MLPA and the PSA.  MLPA § 2.01; PSA § 2.01(a).  Countrywide restated its representations and warranties contained in the MMLPSA for the benefit of the Trust in a Reconstituted Servicing Agreement ("RSA") dated as of September 1, 2006.  Also in the RSA, Countrywide acknowledged the assignment to DBNT of the right under the MMLPSA to enforce Countrywide's obligations, including the obligation to cure or repurchase noncompliant loans.

10473281

RSA at 2-3 ("Recognition of Trust Fund"), 3-4 ("Representations").  The RSA is governed by New York law.  *Id.* at 6.

24.     Ambac agreed to issue an irrevocable financial guaranty insurance policy for the benefit of Class 2A-1C2 certificateholders pursuant to a Commitment Letter between Ambac and Greenwich Capital Markets, Inc. dated October 4, 2006.  The Policy was issued concurrently with the closing of the transaction on October 4, 2006.

25.     As Certificate Insurer, Ambac is an express third-party beneficiary of the PSA.  PSA § 12.10.  In addition, the PSA and the Policy issued by Ambac provide that Ambac is subrogated to the rights of the insured certificateholders and has the right to exercise all rights of the holders of Insured Certificates under the PSA.  PSA §§ 4.05(d), 12.03.

26.     The Harborview 2006-9 governing documents thus establish the basic risk allocation with respect to the Trust.  To the extent Countrywide sold defective loans for inclusion in the Trust, neither Ambac nor any certificateholder bears an increased risk from those loans remaining in the Trust; that risk remains with Countrywide.  Countrywide's representations and warranties, and its corresponding promise to cure or repurchase breaching loans, were material to the Trust's formation and material to assessing the risk associated with the mortgage loans backing the certificates.

## II.     DBNT's Obligations as Trustee of Harborview 2006-9

27.     DBNT's obligations and duties as Trustee of Harborview 2006-9 are established by the PSA and New York common law.  In exchange for promising to fulfill these duties, DBNT is compensated under the PSA by receiving a monthly fee made up of (i) one day's investment earnings on amounts in the Trust's distribution account, and (ii) a percentage of the outstanding principal balance of the securitized loans.  *See* PSA § 8.05.

28.     First and foremost, DBNT has an obligation to acquire and protect the Trust Fund for the benefit of all certificateholders. *See* PSA §§ 2.01(a), 2.02. DBNT declared that it "holds or will hold all other assets included in the definition of 'Trust Fund' in trust for the exclusive use and benefit of all present and future Certificateholders and the Certificate Insurer." PSA § 2.02. The assets in the Trust Fund include the mortgage loans as well as all of the rights conveyed to the Depositor under the MLPA, including the right to enforce Countrywide's repurchase obligations. PSA § 1.01 (definition of "Trust Fund").

29.     Pursuant to the PSA, DBNT has the authority and the obligation to enforce Countrywide's obligation to cure or repurchase loans that breach Countrywide's Loan-Level Warranties. Section 2.03(a) of the PSA provides that

> Upon its discovery or receipt of written notice of . . . the breach by [Countrywide] of any representation, warranty or covenant under the [MMLPSA] in respect of any Mortgage Loan which materially adversely affects the value of that Mortgage Loan or the interest therein of the Certificateholders or the Certificate Insurer, the Trustee shall promptly notify [Countrywide] of such defect, missing document or breach and request that [Countrywide] deliver such missing document or cure such defect or breach within 90 days from the date that [Countrywide] was notified of such missing document, defect or breach, and if [Countrywide] does not deliver such missing document or cure such defect or breach in all material respects during such period, *the Trustee shall enforce [Countrywide]'s obligation under the [MMLPSA] and cause [Countrywide] to repurchase that Mortgage Loan from the Trust Fund* at the Repurchase Price (as defined in the [MMLPSA]) on or prior to the Determination Date following the expiration of such 90 day period.

(Emphasis added.)

30.     Moreover, DBNT was aware that Countrywide's representations and warranties—and DBNT's promise to enforce those representations and warranties—were fundamental elements of the transaction. Indeed, rights to enforce Countrywide's repurchase

10473281

obligations are defined by the PSA to be part of the Trust Fund that DBNT must maintain for the benefit of the Trust, the Certificateholders, and Ambac.

31.     At all times, DBNT has a non-waivable duty to avoid conflicts of interest. That is, it cannot put its own individual interests above those of the Trust or Trust beneficiaries. And at all times, DBNT owes a duty to Trust beneficiaries to carry out its duties under the PSA, including its duty to enforce Countrywide's obligations, with due care.  DBNT is liable to Trust beneficiaries for any harm arising out of its own negligent action, negligent failure to act, or its own willful misconduct, and is not entitled to indemnification from the Trust Fund for any acts undertaken with negligence or willful misconduct.  *See* PSA §§ 8.01, 8.17.

32.     Upon the occurrence of an Event of Default, DBNT assumes heightened duties and must act as a prudent person and a fiduciary.

33.     First, under the PSA, after an Event of Default has occurred, DBNT must "exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs." PSA § 8.01.  DBNT cannot wait for certificateholders to direct it to act or rely on exculpatory provisions in the contracts.

34.     Second, under New York common law, DBNT has an obligation to act prudently following an event of default to secure the basic purpose of the Trust, that is, to protect the assets of the Trust and to ensure repayment of obligations due to the Trust.  Following an Event of Default, DBNT also owes a fiduciary duty to the Trust beneficiaries that requires it to act with undivided loyalty, to pursue best interest of the Trust, and to avoid any action that would prioritize DBNT's interests at the Trust's expense.

10473281

## III.   The Event of Default

35.    As described above, DBNT has heightened obligations after the
occurrence of an Event of Default.  DBNT, and its Responsible Officers, as defined in the PSA,
have had actual knowledge of the occurrence and continuance of an Event of Default since 120
days after the first repurchase requests were sent to Countrywide, which occurred no later than
July 29, 2012.

36.    The Harborview 2006-9 PSA adopts the definition of Event of Default in
the MMLPSA.  PSA § 1.01 (definition of "Event of Default").  Under section 14.01(ii) of the
MMLPSA, an Event of Default occurs upon the "failure on the part of [Countrywide] duly to
observe or perform in any material respect any other of the covenants or agreements on the part
of [Countrywide] set forth in this Agreement which continues unremedied for a period of thirty
days . . . after the date on which written notice of such failure, requiring the same to be remedied,
shall have been given to [Countrywide] by the Purchaser or by the Custodian."

37.    According to ABS-15G filings made by RBS Financial Products Inc.
(formerly known as Greenwich Financial Products Inc.), the underwriter of Harborview 2006-9,
as of the quarter ending March 31, 2012, 1,719 loans were the subject of outstanding repurchase
demands.  DBNT has confirmed that it received notice from a certificateholder of breaches of
representations and warranties with respect to at least 1,694 mortgage loans in 2012.  Under the
PSA, DBNT was required to give notice of such breaches to Countrywide and the Depositor.
PSA § 2.03(a).  Based on the timing of repurchase demands as reported in SEC filings,
Countrywide's 90-day period to cure the breaches or repurchase the loans expired no later than
June 29, 2012.  Countrywide did not repurchase a single one of the 1,719 loans identified in
breach notices, nor did it repurchase any of the other loans in the Trust regarding which it
independently discovered breaches of its representations and warranties.

12

38.     On August 10, 2018, DBNT informed Ambac and certificateholders that the certificateholder that issued the 2012 repurchase demands purported to rescind them in 2017. DBNT provided no further information about the nature and circumstances of this correspondence from the certificateholder that provided the breach notice, nor what steps DBNT took to respond to or investigate it.  Nevertheless, the "rescission" would have no effect on Countrywide's obligation to repurchase breaching loans, which is triggered not just by Countrywide's receipt of written notice of breaches, but also by its own discovery of breaches. *See* PSA § 2.03.  For the same reason, the certificateholder's "rescission" does not affect the existence of an Event of Default, which is premised on Countrywide's failure to abide by its contractual obligations in the MMLPSA.

39.     Moreover, on information and belief, an Event of Default likely existed even earlier.  Pursuant to section 2.02 of the PSA, DBNT, or the Custodian acting on its behalf, was required to "review each Mortgage File delivered to it" and to issue an interim and final certification accompanied by a document exception report.  In the final certification, due 180 days after closing, DBNT, or the Custodian on its behalf, certified that (i) for those loans identified on the Mortgage Loan Schedule, there was full and complete loan documentation in accordance with the requirements of the PSA; except that (ii) for those loans identified on the document exception report, DBNT had not obtained complete required documentation.

40.     DBNT, or the Custodian acting on its behalf, had a duty to identify in the final certification and exception report any mortgage files that were missing documentation required to be delivered under the PSA.  Such documentation typically includes documents sufficient to prove ownership of the note and mortgage or otherwise protect title.  Given the duties to review the mortgage file and identify missing documents in the exception reports,

13

DBNT should have known of numerous instances where it did not receive (i) the original

mortgage note with all intervening endorsements showing a complete chain of endorsement from

the Originator to the Sponsor or Depositor, or a lost mortgage note affidavit and a duly executed

assignment of mortgage for each loan that was not a MERS loan1; (ii) the original recorded

mortgage for each loan that was not a MERS loan; (iii) the original mortgage for those loans that

were MERS loans; and/or (iv) the original recorded assignment of mortgage and each

intervening assignment.

      41.    An Event of Default therefore occurred shortly after 180 days after the

final exception report was delivered because Countrywide failed to cure or repurchase the loans

that were identified by DBNT as not having the contractually required documentation. DBNT

had the ability, obligation, and duty to provide notice to Countrywide of such breaches under the

PSA and under common law principles of good faith and its extra-contractual duties to exercise

due care. To the extent that DBNT knew of and failed to give Countrywide notice of these

breaches, it cannot rely on that failure to defeat a finding that an Event of Default occurred or to

avoid its heightened post-Event of Default duties.

## IV.    The Settlement Offer and Certificateholder Solicitation

      42.    On June 13, 2018 DBNT issued a notice (the "June 13 Notice")

announcing a settlement offer from Countrywide and Bank of America and attaching a copy of a

Trust Settlement Agreement ("Settlement Agreement") dated as of May 25, 2018 among Bank of

America National Association, Countrywide, the Initiating Certificateholders[2], and DBNT, with

---

[1] "MERS" is the Mortgage Electronic Registration Service, an electronic database used to track mortgage loan ownership.

[2] The Initiating Certificateholders are Forethought Life Insurance Company, Commonwealth Annuity and Life Insurance Company, Global Atlantic Assurance Limited, Accordia Life and Annuity Company, Athene Annuity & Life Assurance Company, Athene Annuity & Life Assurance Company of New York, and Aegon USA Investment Management LLC.

all parties but DBNT having already executed the document.  On June 29, 2018, DBNT issued a supplemental notice (the "June 29 Notice") correcting certain errors in the June 13 Notice and attaching a memorandum from the Initiating Certificateholders' counsel urging DBNT to accept the Settlement Agreement.

43.     The June 13 Notice announced that DBNT had been informed that the Initiating Certificateholders had negotiated the Settlement Agreement in the spring of 2018.  The economic terms of the Settlement Agreement provided that Countrywide and Bank of America would pay the Trust $38 million to be deposited in the Trust and distributed to holders of certificates backed by Group 2 mortgage loans.  In addition, Countrywide and Bank of America agreed to pay $1.14 million to the Initiating Certificateholders' attorneys.  In exchange, the Settlement Agreement provides for DBNT to release—on the Trust's behalf—any potential claims against Countrywide and Bank of America related to the Trust or the securitized loans, including claims related to the origination or servicing of the loans, breaches of any representations and warranties, the obligation to repurchase the loans, or the obligation to give notice of any breaches with respect to the loans.  The release would prevent the Trustee from bringing such claims against Countrywide and Bank of America and also prevent any certificateholder from bringing claims derivatively on behalf of the Trust.  While the release protects Countrywide and Bank of America from any indemnification claim brought on behalf of the Trust, it expressly preserves any indemnification right DBNT may have in its personal capacity.

44.     The Settlement Agreement also sets forth a process for DBNT to seek approval of the settlement.  It provides that DBNT will solicit certificateholder views on the Settlement Agreement and accept the Settlement Agreement unconditionally if (i) 25% of the

Voting Rights in the Trust are exercised in favor, excluding any Voting Rights controlled by Countrywide, Bank of America, or their corporate affiliates, and (ii) the "yes" votes outnumber the "no" votes.  An acceptance under this provision must be given no later than August 23, 2018. In the June 13 Notice, DBNT set July 20, 2018 as the deadline for certificateholders to respond to the solicitation.

45.     The Settlement  Agreement provides for an alternative track if more Voting Rights are exercised in favor of the Settlement Agreement than against it (this time, not excluding Voting Rights controlled by Countrywide or Bank of America), but the "yes" votes do not reach the 25% threshold.  In that situation, the Trustee may "elect to initiate judicial approval proceedings" seeking an order "(i) determining that the Trustee is authorized to accept the Settlement by execution and delivery of this Agreement, and to perform and implement this Agreement and the Settlement set forth herein, (ii) finding that the legal and beneficial owners of certificates received legally sufficient notice of the Approval Proceeding and an opportunity to object, (iii) authorizing the Trustee to distribute the Net Payment to the Certificateholders pursuant to [the Settlement Agreement], and (iv) declaring that this Agreement is binding on the Trust."  Under this option, the settlement acceptance deadline is extended to November 21, 2019, to allow DBNT to file the trust instruction proceeding and obtain the contemplated court order.

46.     Though DBNT has not yet signed the Settlement Agreement, and is not bound by its terms, the June 13 Notice indicates that DBNT will conduct a certificateholder solicitation and accept the Settlement Agreement exactly as envisioned by Countrywide, Bank of America, and the Initiating Certificateholders.  The only variance is that DBNT "reserves the right" to accept the Settlement Agreement *even if* the specified voting thresholds are not met.

47.     DBNT distributed a further notice to certificateholders concerning the
Settlement Agreement on July 18, 2018 (the "July 18 Notice"), just two days before the original
July 20 solicitation deadline.  The July 18 Notice bears the date July 17, 2018, but was not
posted on DBNT's investor website until July 18, 2018, and, on information and belief, many
certificateholders may not have received the July 18 Notice until days later.  The July 18 Notice
extended the solicitation deadline from July 20, 2018 to August 15, 2018.

48.     The July 18 Notice informed certificateholders, for the first time, that "[a]s
of October 2, 2012, the Trust has been a party to a series of tolling agreements with Bank of
America and Countrywide relating to potential claims with respect to the Trust. The tolling
period currently expires as of October 1, 2018 (or such earlier date if the agreement is terminated
in accordance with its terms)."  The July 18 Notice further informed certificateholders that all of
the tolled claims would be released under the Proposed Settlement.

49.     The July 18 Notice also attached a letter from Ambac's counsel to DBNT,
dated June 29, 2018, raising Ambac's objections to the Settlement Agreement, disputing the
process DBNT had implemented to accept or reject the Settlement Agreement, and informing
DBNT that it was subject to heighted post-Event of Default duties.  Ambac was aware of the
existence of the tolling agreement but, because DBNT had provided a copy to Ambac only under
the terms of a strict confidentiality agreement, Ambac had not been permitted to share this
crucial information with other certificateholders until DBNT made the tolling agreement publicly
known through the July 18 Notice.

50.     Unbeknownst to Ambac, DBNT had shared a copy of its letter with
counsel for the Initiating Parties.  The July 18 Notice also attached a July 12, 2018 letter from

17

Talcott Franklin, one of the attorneys for the Initiating Parties, purporting to respond to the points raised in Ambac's letter.

51.    On August 10, 2018, DBNT issued a further holder notice (the "August 10 Notice").  This notice attached an August 6, 2018 letter from Ambac sharing its further views on the Proposed Settlement, and extended the solicitation deadline to August 21, 2018.

## V.    DBNT's Actions Have Violated and Will Violate Its Contractual and Fiduciary Obligations

52.    DBNT's response to the offered Settlement Agreement violates its common law and contractual duties in multiple ways.  First, the procedure DBNT has adopted to determine whether and when to accept the Settlement Agreement is inconsistent with its post-Event of Default obligations to act in the best interest of the Trust as a whole, rather than in its own interest or in the interests of a subgroup of certificateholders.  Second, no matter what steps DBNT takes, no reasonable person or fiduciary would ever agree to release the Trust's claims for less than 5% of their value.

### A.    DBNT Breached Its Post-Event of Default Duties by Failing to Independently Evaluate the Settlement Agreement and By Instituting a Flawed Voting Process

53.    As described above, once an Event of Default has occurred, DBNT must exercise all of its rights and powers under the transaction documents as a prudent person would, and it must act as a fiduciary to protect the assets of the Trust and the interests of all Trust beneficiaries.  Following an Event of Default, DBNT cannot wait for certificateholder direction to take the necessary actions to protect the Trust, and it cannot put its own interests ahead of certificateholders'.  DBNT's conduct violated these precepts in multiple ways.

54.    First, DBNT cannot rely on a settlement negotiated by a small group of holders with no involvement from DBNT.  No prudent person would rely on an unknown party,

with unknown motivations, to settle the Trust's valuable litigation claims.  The Initiating

Certificateholders may have their own peculiar motivations for accepting this paltry settlement,

or may be acting in the best interest of their class of certificates to the detriment of Trust

beneficiaries lower in the capital structure.  If the Initiating Certificateholders hold certificates in

the most senior tranches, a relatively small settlement may be sufficient to protect the value of

their investment, and any additional settlement consideration would not result in an increased

payout on their investment.  Certificateholders are free to act for their own economic advantage.

DBNT's obligation, however, is to act in the best interests of the Trust as a whole, not a small

group (or even class) of holders.  This is particularly the case where Countrywide's breach of

contract affected more junior certificateholders most acutely.  Moreover, the fact that the

Initiating Certificateholders negotiated compensation for their attorneys of *$1.14 million* strongly

suggests they acted with their own interests at heart.

       55.    Further, DBNT cannot and should not take at face value the Initiating

Certificateholders' claim that the settlement was the result of a hard-fought negotiation.  Indeed,

in another trust from the same Harborview shelf, several of the Initiating Certificateholders,

represented by the same counsel, negotiated a settlement with Countrywide and Bank of America

that they claimed was arm's length and in the best interest of the trust.  But, when the trustee

stepped in under pressure from Ambac and others, Countrywide and Bank of America increased

their settlement offer by 65%, from $57 million to $94 million.  In another example, the same

counsel who represented the Initiating Certificateholders negotiated a settlement with UBS Real

Estate Securities, Inc. and Countrywide to settle RMBS claims on three trusts for $543 million.

When the trustee and its experts considered the views of other certificateholders, examined the

settlement in light of the strength of the trusts' claims, consulted with a former federal magistrate

judge on the value of the litigation, and consulted an economics expert, it rejected the settlement as not providing fair value to the trusts and their certificateholders.  Ultimately, the trustee continued the litigation while stepping in to handle settlement negotiations itself and settled the case for $850 million—56% higher than the initial settlement offer.  These examples demonstrate that, even setting aside the peculiar motivations that one group of certificateholders may have in negotiating a settlement, the presence of the trustee in negotiations substantially alters the settlement dynamic.  Relying on a settlement negotiated by a group of certificateholders often means leaving trust money on the table.

56.     Second, DBNT's decision to conduct a certificateholder solicitation at the behest of Countrywide, Bank of America, and the Initiating Certificateholders, is contrary to its obligations under the post-Event of Default standard.  After an Event of Default has occurred, a trustee cannot abdicate its obligation to act in the best interests of the trust in favor of a certificateholder straw poll.  Rather, the trustee must independently exercise its judgment to determine if a particular course of action best protects the trust's assets and is consistent with how a prudent person would manage its own affairs.  DBNT cannot rely on the opinions of a subgroup of certificateholders, or even a majority of certificateholders, to make its decisions.

57.     Furthermore, the vote as set up by Bank of America and Countrywide— and as adopted by DBNT—will not capture the range of certificateholder views because it is based on the PSA's definition of Voting Rights.  "Voting Rights," as defined in the PSA and as used in the Settlement Agreement, are allocated among the certificateholders in proportion to the current face value of their certificates, and to Ambac in proportion to the current face value of the Insured Certificates.  As certificates are paid down or written down due to losses, their current face value, and therefore their share of associated Voting Rights, decreases.  This

10473281

structure makes sense when Voting Rights are used to measure certificateholders' views on the ongoing operation of the Trust, such as whether to replace the existing servicer.  But when considering an issue that affects certificates that suffered losses in the past, like the Settlement Agreement meant to redress past breaches of contract by Countrywide, the use of Voting Rights has a perverse effect:  Holders of certificates whose value has been wiped out due to Countrywide's failure to repurchase breaching loans have no say in whether DBNT accepts the Settlement Agreement.  While the PSA expressly requires the use of Voting Rights for certain types of certificateholder action, it is silent about the voting process to be used to review settlements of representation and warranty violations.  Nothing in the Trust's governing documents requires that the defined term be used when soliciting certificateholder views on issues like a settlement of Trust claims, particularly where the harm was felt largely by investors whose certificates have been written down to zero.

58.     By using the defined term Voting Rights, Bank of America and Countrywide set up the vote to ensure that those holders lower in the capital structure—the very holders who have suffered the greatest loss due to Countrywide's breaches—do not have a say in whether or not to accept a settlement.  Meanwhile, holders with Voting Rights also have a higher payment priority; under the waterfall they might be made whole by even a paltry settlement amount like the one offered by Bank of America and Countrywide. The Trustee has offered no justification for its decision to adopt the voting structure set up by Bank of America and Countrywide and to solicit the views of only those investors whose certificates have current face value.  Even if, contrary to its stated plan, DBNT used the vote merely as an input to its own decision-making process rather than as an outcome-determinative event, this structure still would make no sense because it disenfranchises the holders with the greatest stake in the settlement.

10473281

59.     Third, DBNT demanded that certificateholders vote based on incomplete information.  DBNT did not inform certificateholders that an Event of Default has occurred on this Trust, despite its contractual obligation to do so.  *See* PSA § 7.04(b).  DBNT did not share with certificateholders that over 1,700 loans valued at $400 million were found to be breaching more than six years ago, or that DBNT itself failed to enforce Countrywide's obligation to repurchase those loans.  DBNT did not inform certificateholders that the Trust had viable claims against Countrywide or the expected value of those claims.  DBNT did not inform certificateholders of the existence of the tolling agreement dating back to 2012, or that DBNT itself had taken the position that similarly situated trusts could bring timely repurchase claims.  None of this information was available to certificateholders until (at the earliest) July 18, 2018, when DBNT included Ambac's letter in the July 18 Notice.  By the time they received the July 18 Notice, many certificateholders had likely already submitted their votes.

60.     DBNT aggravated the situation by including in its June 13 Notice a memorandum from the Initiating Certificateholders' counsel supporting the settlement as a "fair and reasonable" resolution of the Trust's claims.  The Initiating Certificateholders highlighted the New York Appellate Division's decision in *Deutsche Bank National Trust Co. v. Barclays Bank PLC*, 156 A.D.3d 401 (2017) ("*SABR 2007-BR1*"), which held that New York's borrowing statute required DBNT to bring claims on behalf of two unrelated RMBS trusts within four years of the securitizations' closing dates.  The *SABR 2007-BR1* decision remains subject to further appellate review, and does not foreclose the ability of the Trust to bring timely claims.  Yet, for the period between June 13 and July 18, when certificateholders were evaluating the Proposed Settlement and when many with Voting Rights likely voted, DBNT chose to leave certificateholders with a misleading picture of the timeliness of the Trust's claims by (1) failing

22

to disclose the existence of a tolling agreement, (2) allowing the Initiating Parties to imply that the *SABR 2007-BR1* decision made the Trust's claims untimely, and (3) withholding DBNT's own views—as stated in other court filings—that *SABR 2007-BR1* was subject to reversal and that DBNT could bring timely claims on a trust like Harborview 2006-9 by filing suit in California. Thus, even in the context of an already unfair and unreasonable voting process concerning its response to the Proposed Settlement, DBNT put a thumb on the scales to favor acceptance.

61.     Fourth, DBNT breached its obligations by accepting the approval structure set forth in the Settlement Agreement, which had the effect of ensuring that the Settlement Agreement would be accepted. The Initiating Certificateholders have already contracted to exercise their Voting Rights in favor of the Settlement Agreement, and state insurance filings establish that as of the end of 2017 the Initiating Certificateholders held a substantial percentage of the Voting Rights in the Trust, perhaps exceeding the 25% threshold on their own. The Initiating Certificateholders, Bank of America, and Countrywide, of course, know what percentage of the Voting Rights each of them hold, and could use that information in structuring the vote to make acceptance all but guaranteed. DBNT, by contrast, generally does not know the identity of certificateholders or the size of their holdings unless it undertakes to investigate. In acquiescing to the voting structure proposed by the Initiating Certificateholders, Bank of America, and Countrywide, DBNT was acting at a substantial information disadvantage. Thus, it is very likely that the prerequisites for unconditional approval will be met based on the vote results alone.

62.     Even if DBNT does not unconditionally accept the settlement, the alternative path to approval through a court proceeding is all but assured to succeed as well.

23

Under the Settlement Agreement, if DBNT does not receive 25% of Voting Rights exercised in favor of the Settlement Agreement, it will file a court proceeding before accepting the Settlement Agreement. But, the court proceeding envisioned by the Settlement Agreement, and the course of action adopted by DBNT in the June 13 Notice, contemplates an extremely narrow proceeding that will seek an order stating only that DBNT is authorized to accept and implement the Settlement Agreement. Neither the Settlement Agreement nor DBNT contemplate a proceeding addressing whether the Settlement Agreement is a fair resolution of the Trust's claims or whether DBNT acted reasonably or appropriately in accepting it. There is no dispute that DBNT is "authorized" to accept the Settlement Agreement: An RMBS Trustee has the authority to bring claims in the Trust's name and, by extension, to settle or release them. *In re Bank of N.Y. Mellon*, 42 Misc. 3d 1237(A), 2014 N.Y. Misc. LEXIS 1125, at *26 (N.Y. Sup. Ct. 2014) (holding that a PSA "effectively grants the Trustee the power and authority to commence litigation. . . . Inherent in the Trustee's power to commence litigation is the power to settle litigation."), *aff'd*, 127 A.D.3d 120 (1st Dep't 2015). Thus, there is little doubt that, even under this alternative route, DBNT will obtain the contemplated court approval and the Settlement Agreement will become effective and binding on the Trust.

63.     DBNT has stated that it will not reject the Settlement Agreement outright unless it receives not a single vote in favor, an impossibility given the Initiating Certificateholders' covenant to exercise their Voting Rights in favor. For the reasons given above, DBNT's acceptance of the Settlement Agreement is a virtual certainty.

**B.     Accepting a $38 Million Settlement on the Trust's Behalf Violates DBNT's Obligations to Act as Prudent Person and a Fiduciary**

64.     As a substantive matter, no prudent person or fiduciary would accept a settlement of repurchase claims on behalf of Harborview 2006-9 for $38 million. For any RMBS

trust pursuing breach of representation and warranty claims, the two necessary inputs to determine the value of potential claims are the level of losses and the rate at which loans breach representations and warranties. Here, the losses are known: $890 million for the Trust as a whole and $568 million for Group 2 loans alone.

65.     Because DBNT abdicated its duty to investigate breaching loans in the Trust, it did not know the breach rate when it received the Settlement Agreement. To have arrived at a settlement value of $38 million, however, even for Group 2 alone, the Initiating Certificateholders must have concluded that 6.7% was a reasonable estimate of the breach rate (discounted by litigation risk). That is untenable. As a starting point, it is inconsistent with the repurchase demands made on this trust. Even if the 1,719 putback demands were the end result of a review of the entire Trust (and not, as is more likely, a small portion of it), the breach rate would still be close to 25%, suggesting a damages figure for Group 2 loans of $143 million.

66.     Ambac has conducted reunderwriting on the loans in the Trust as part of an unrelated fraudulent inducement suit against Countrywide. In its August 6, 2018 letter to DBNT, Ambac disclosed to DBNT that its forensic review of a statistically significant random sample of loans from each loan group in the Trust had uncovered breach rates of 95% in Group 1 and 96% in Group 2 loans. (Ambac was unable to share this breach rate with DBNT earlier because it received the loan files used for reunderwriting from Countrywide pursuant to a protective order. Out of an abundance of caution, Ambac did not disclose the breach rate to DBNT until Countrywide agreed that Ambac could do so, and that DBNT could share the breach rate with certificateholders if it chose to do so.) These astronomically high breach rates confirm that if DBNT had carried out its obligations to enforce Countrywide's repurchase obligation, it

10473281

would have been able to establish that Countrywide's loans breached representations and warranties on a massive scale.

67.   Moreover, publicly available information about Countrywide loans originated during the relevant period corroborates the breach rate found by Ambac and the volume of repurchase demands reported in ABS-15Gs.  In Harborview 2005-10, for example, a closely-related trust backed by the same type of first lien loans originated by Countrywide, the trustee (not DBNT) stated in a public complaint that its reunderwriting expert had found a breach rate of 87% after reviewing a representative sample of loans.  Fourth Amended Complaint, *U.S. Bank Nat'l Ass'n v. Countrywide Home Loans, Inc.*, No. 652388/2011 (N.Y. Sup. Ct. N.Y. Cnty. Sep. 20, 2016), NYSCEF No. 371, at ¶¶ 14-16.  Plaintiffs in other suits against Countrywide (including Ambac) have identified similarly high breach rates in Countrywide loans originated in 2005 and 2006.  *See, e.g.*, Ambac's Mem. of Law in Support of Mot. for Partial Summary J. Regarding Primary Liability, *Ambac Assur. Corp. v. Countrywide Home Loans, Inc.*, No. 651612/2010 (N.Y. Sup. Ct. N.Y. Cnty. July 14, 2015), NYSCEF No. 1455, at 10 (78% breach rate across 17 Countrywide securitizations).

68.   Given the Trust's staggering losses and equally staggering breach rate, the only potential basis to discount the value of the Trust's claims is statute of limitations risk. Indeed, statute of limitations is the sole basis cited by the Initiating Certificateholders to attempt to justify the settlement amount they negotiated.  But no prudent person or fiduciary could reasonably take the view that the statute of limitations risk on this Trust is so great that a 6.7% settlement is justified.

69.   DBNT has already taken the view (contrary to that expressed by the Initiating Certificateholders) that the decision in *SABR 2007-BR1* does not mean the Trust's

claims are untimely.  As an initial matter, DBNT continues to seek further appellate review of the *SABR 2007-BR1* decision, arguing that the decision's legally flawed reasoning should be overturned.  But even if the decision stands, DBNT has told the courts on multiple occasions that no matter the rulings of the New York courts, it could file a timely suit in California (where Countrywide is subject to personal jurisdiction) for a trust situated similarly to Harborview 2006-9.  For example, DBNT wrote in its brief to the New York Court of Appeals that claims in *SABR 2007-BR1* "would have been timely if originally filed in California."  Mem. of Law in Support of Mot. for Leave to Appeal, *Deutsche Bank Nat'l Tr. Co. v. Barclays Bank, PLC et al.*, Nos. 651338/13, 652001/13 (N.Y. May 29, 2018), at 40-42.; *see also* Br. for Pl.-Resp., *Deutsche Bank Nat'l Tr. Co. [SABR 2007-BR1] v. Barclays Bank PLC*, No. 651338/13 (1st Dep't Nov. 2, 2016), at 51 (California court "would apply New York's six-year statute of limitations").  DBNT obtained a tolling agreement within six years of the Trust's closing date, and so DBNT's own position is that it could file suit today in California and obtain full recovery from Countrywide.

70.     Despite the existence of the tolling agreement and the availability of judicial remedies, DBNT has failed to bring claims on behalf of the Trust and thus failed to realize any recovery on behalf of certificateholders.  And worse, DBNT actively concealed the existence of the tolling agreement from certificateholders for years, preventing Trust beneficiaries from agitating for DBNT to bring suit.  During the time they were kept in the dark about the tolling agreement, numerous certificateholders' Voting Rights were diminished to zero due to mounting collateral losses.  Moreover, had DBNT attempted to vindicate the Trust's rights by filing suit earlier, it could have realized a significant recovery before the *SABR 2007-BR1* decision was issued.

10473281

71.     Setting aside the length of the statute of limitations that governs claims brought by DBNT, there are at least two other paths for DBNT to assert valuable claims on behalf of the Trust against Countrywide. First, this fall the New York Court of Appeals will hear oral argument in another representation and warranty case involving a trust on the Harborview shelf, *Deutsche Bank National Trust Co. [Harborview 2007-7] v. Quicken Loans, Inc.*, No. APL-2016-00237. The question in that case is whether a contractual provision that states that claims do not accrue until repurchase has been requested and denied has the effect of delaying the accrual of a cause of action. Harborview 2006-9 has an identical "accrual provision," and, therefore, a Court of Appeals reversal in *Harborview 2007-7* would have the effect of making the Trust's claims timely even if filed in New York. Second, New York courts have held—and DBNT itself has argued—that a trustee can bring a claim for the originator's breach of its duty to notify securitization counterparties of loan-level defects. *See Nomura Home Equity Loan, Inc. v. Nomura Credit & Capital, Inc.*, 133 A.D. 96, 108 (1st Dep't 2015); *FHFA v. Morgan Stanley ABS Capital I Inc.*, 59 Misc. 3d 754 (N.Y. Sup. Ct. 2018).

72.     DBNT chose not to inform certificateholders of any of the arguments it has made in similar cases that establish multiple paths to recovery against Countrywide and Bank of America. But in making its own, prudent assessment of the Settlement Agreement, as it is required to do following the an Event of Default, DBNT cannot ignore the legal strength of its own case in favor of the views of third parties who may not share (or even have been aware of) its view of the Trust's valuable claims.

## C.     DBNT Put Its Own Interests Ahead of Certificateholders' Interests

73.     DBNT's decisions—to entertain a plainly inadequate Settlement Agreement rather than enforcing the Trust's rights, to withhold information from certificateholders, and to institute a flawed voting process designed by its adversary to ensure

28

approval of the Settlement Agreement—result from DBNT's putting its own interests ahead of the Trust's. DBNT, like many RMBS trustees, has always been a reluctant plaintiff, refusing to file suit unless directed and indemnified to do so by a large group of certificateholders. After an Event of Default, however, DBNT can no longer rely on the exculpatory provisions in the PSA to avoid its obligation to protect the Trust's assets. DBNT cannot put its own desire for indemnification—a right personal to DBNT, with no benefit to Trust beneficiaries—above its obligation to enforce Countrywide's representations and warranties.

74.     Moreover, DBNT is a defendant in multiple suits in this District and in California based on its failures as trustee to vindicate the rights of other RMBS trusts, including by failing to assert repurchase claims against transaction counterparties like Countrywide and Bank of America. Perhaps understandably, DBNT may not wish to achieve a high-value settlement with respect to the Trust, which could increase its exposure to damages in those suits by demonstrating the strength and value of the repurchase rights it failed to enforce. This is not a legitimate reason for DBNT to abdicate its responsibilities to the Trust by accepting the grossly inadequate Proposed Settlement.

75.     Finally, DBNT itself is part of a corporate family that is deeply enmeshed in the RMBS production cycle that led to the 2008 financial crisis, and its corporate affiliates are frequent targets of litigation. Many of these lawsuits were ongoing when the Event of Default occurred in Harborview 2006-9. For example, in 2011, the Federal Housing Finance Agency, as conservator of Freddie Mac and Fannie Mae, filed suit against Deutsche Bank AG alleging widespread misrepresentations in offering materials in securitizations sponsored by and backed by loans from DBNT's corporate affiliates. *See* Am. Compl., *Fed. Housing Fin. Agy. v. Deutsche Bank AG*, No. 11-cv-06192 (S.D.N.Y.). Deutsche Bank settled those claims for $1.9

billion in 2013. It wasn't until 2017 that Deutsche Bank AG settled charges brought by the Department of Justice for misleading investors in the packaging, securitization, marketing, sale and issuance of RMBS between 2006 and 2007. The $7.2 billion settlement was the largest of its kind. Moreover, between 2012 and 2014, DB Structured Products, Inc. was named as a defendant in over 20 suits for breaches of representations and warranties—precisely the type of claim DBNT should have been asserting against Countrywide. DBNT may have preferred not to bring litigation that would force it to take positions contrary to the interests of its corporate affiliates. But DBNT cannot sacrifice the Trust's claims to favor the rhetorical positions of its affiliates without violating its duty of undivided loyalty to Harborview 2006-9 and its beneficiaries.

76.     Under the heightened standards imposed by the PSA and New York common law following an Event of Default, DBNT could not consider its personal interests or potential exposure in responding to the Settlement Agreement. Its only concern should have been securing the best interests of the Trust and certificateholders, to whom DBNT owes undivided loyalty and whose interests it must hold above its own.

**VI.    Harm to Ambac**

77.     The harm Ambac suffered from DBNT's refusal to file suit against Countrywide and Bank of America for the six years in which an Event of Default has been in existence has now materialized through the Settlement Agreement, which will be accepted imminently. Because the Settlement Agreement fails to adequately compensate the Trust for releasing its claims against Countrywide, it harms Ambac.

78.     As Certificate Insurer, Ambac is responsible for making payments to the Trust for distribution to Insured Certificateholders when the cashflows from the securitized mortgages are insufficient to make a scheduled principal and interest payment. Countrywide's

10473281

systematic breaches of the representations and warranties about the quality and creditworthiness of loans included in Harborview 2006-9 has resulted in a pool that is vastly riskier than the pool Ambac agreed to insure. Ambac has incurred significant harm, and continues to incur significant harm, as a consequence of Countrywide's violation of its obligation to repurchase breaching loans. Ambac has paid $29 million in claims payments on this single RMBS transaction.

79.     If Countrywide had complied with its contractual obligations to repurchase breaching loans by remitting the contractual Repurchase Price to the Trust, Ambac would be made whole through the Trust's "waterfall" of payment distributions, either because claims on the Policy would have been avoided in the first instance, or because the Repurchase Price paid by Countrywide would have been distributed according to the PSA, entitling Ambac to receive distributions as subrogee of the holders of the insured certificates to the extent of the claims Ambac had paid under the Policy. *See* PSA § 4.05(d).

80.     Similarly, if Countrywide and Bank of America are ordered by a court to pay damages to the Trustee in an amount equivalent to the repurchase obligations, that sum would be deposited in the Trust and distributed through the waterfall to Ambac and to certificateholders. If DBNT had negotiated an appropriate settlement of the Trust's claims, the settlement consideration would likewise go to making Ambac and certificateholders whole and to providing an additional collateral cushion that would protect Ambac from having to make claims payments in the future.

81.     DBNT's acceptance of an inadequate, unfair, and unreasonable settlement means that Ambac will not receive any compensation through the waterfall and the Insured Certificates will receive less structural protection against future losses than they otherwise would, while the release of the Trust's claims means that the Trust would forever give up the

right to recover more from Countrywide and Bank of America.  Because Ambac must rely on

DBNT to protect its rights under the PSA, any action DBNT takes to compromise those claims

directly harms Ambac, including the steps DBNT has already taken to ensure the acceptance of

the Settlement Agreement and its failure over a period of years to enforce the Trust's claims

against Countrywide and Bank of America.

## VII.    The No Action Clause Does Not Apply to This Suit Against DBNT

82.    The no action clause in the PSA does not apply to this lawsuit because the

claims are brought against DBNT as Trustee, not against a third party.  In addition, the claims are

brought directly by Ambac against DBNT, not derivatively on behalf of the Trust.  Under New

York law, compliance with a no action clause is excused in a suit brought by trust beneficiaries

against a trustee for its own wrongdoing.  Additionally, no action clauses do not apply to claims

brought against a trustee for breach of fiduciary duty or other extra-contractual duties.

83.    Further, even if a demand to initiate suit were required, it would be futile

for Ambac to make such a demand on DBNT as it would be absurd to ask the Trustee to sue

itself for its own misconduct.

**FIRST CAUSE OF ACTION**
**(Declaratory Judgment)**

84.    Ambac realleges and incorporates by reference paragraphs 1 through 83 of

this Complaint.

85.    The PSA is a valid contract that establishes DBNT's contractual duties

and obligations, in its capacity as Trustee, to the Trust, to Ambac, and to certificateholders.

86.    The PSA adopts the definition of Event of Default in the MMLPSA,

which provides that an Event of Default occurs upon the "failure on the part of [Countrywide]

duly to observe or perform in any material respect any other of the covenants or agreements on

10473281

the part of [Countrywide] set forth in this Agreement which continues unremedied for a period of thirty days . . . after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to [Countrywide] by the Purchaser or by the Custodian."

87.     One of the "covenants or agreements" undertaken by Countrywide in the MMLPSA, as reconstituted by the RSA, is to correct or cure any breach of its representations and warranties that materially and adversely affects the value of the associated mortgage loan, or to repurchase the affected loan.

88.     Countrywide received notice that numerous loans in Harborview 2006-9 materially and adversely breached Countrywide's representations and warranties made under the MMLPSA, as reconstituted by the RSA, and a demand that Countrywide cure or repurchase those loans within the applicable 90-day cure period.  Countrywide failed to cure the breaches or repurchase the breaching loans.

89.     Countrywide also independently discovered breaches of its representations and warranties under the MMLPSA, as reconstituted by the RSA, obligating it to cure the breaches or repurchase breaching loans with 90 days.  Countrywide failed to do so.

90.     A real and justiciable controversy exists over whether these events resulted in the occurrence and continuance of an Event of Default as defined by the PSA.

91.     Accordingly, Ambac requests a declaration that (i) an Event of Default occurred under the PSA, (ii) such Event of Default has continued to the present, and (iii) DBNT and its Responsible Officers have actual knowledge of the occurrence and continuance of such Event of Default.

10473281

## SECOND CAUSE OF ACTION
### (Breach of Contract)

92.    Ambac realleges and incorporates by reference paragraphs 1 through 91 of this Complaint.

93.    The PSA is a valid contract that establishes DBNT's contractual duties and obligations, in its capacity as Trustee, to the Trust, to Ambac, and to certificateholders.

94.    Ambac is an express third-party beneficiary of the PSA in its own right and as subrogee of insured certificateholders.  Ambac is entitled to enforce DBNT's performance as Trustee.

95.    Under the PSA, upon an Event of Default and while an Event of Default continues uncured, DBNT must exercise the rights and powers vested in it under the PSA and shall exercise the same degree of care and skill in its exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

96.    An Event of Default occurred at least as early as July 29, 2012, and remains uncured through the present.  DBNT and its Responsible Officers had and continue to have actual knowledge that an Event of Default occurred and is continuing.

97.    Notwithstanding its heightened duties following an Event of Default, DBNT failed to investigate breaches of representations and warranties in the Trust; failed to institute suit or otherwise take any steps to enforce Countrywide's obligation to repurchase breaching loans; failed to immediately reject the inadequate Settlement Agreement; and instituted a certificateholder approval process for the Settlement Agreement that is inconsistent with its obligation to protect the interests of the Trust as a whole.  DBNT acquiesced in and is poised to imminently accept an unreasonably low settlement with Countrywide and Bank of America on the Trust's behalf, releasing the Trust's valuable claims against Countrywide and

10473281

Bank of America in exchange for grossly inadequate compensation. No prudent person managing its own affairs would have taken these actions.

98.     DBNT's material breaches of the PSA in accepting a plainly inadequate settlement will directly and proximately cause damage to Ambac by depriving the Trust of valuable claims and remedies, and by squandering hundreds of millions of dollars in Trust assets, which would otherwise benefit Ambac by reimbursing it for past draws on the Policy and by creating a greater collateral cushion to reduce future draws on the Policy.

## THIRD CAUSE OF ACTION
### (Breach of Fiduciary Duty)

99.     Ambac realleges and incorporates by reference paragraphs 1 through 98 of this Complaint.

100.     Under New York law, at all times DBNT owes a duty to Trust beneficiaries to avoid conflicts of interest and, after the occurrence of an Event of Default, DBNT owes a fiduciary duty to the Trust and to all certificateholders, which encompasses a duty to exercise all contractually conferred rights and powers in good faith and for the benefit of Ambac and of certificateholders to preserve the assets of the Trust.

101.     An Event of Default occurred at least as early as July 29, 2012, and remains uncured through the present. DBNT and its Responsible Officers had and continue to have actual knowledge that an Event of Default occurred and is continuing.

102.     Notwithstanding its obligation to act as a fiduciary following an Event of Default, DBNT failed to investigate breaches of representations and warranties in the Trust; failed to institute suit or otherwise take any steps to enforce Countrywide's obligation to repurchase breaching loans; failed to immediately reject the inadequate Settlement Agreement; and instituted a certificateholder approval process for the Settlement Agreement that is

10473281

inconsistent with its obligation to protect the interests of the Trust as a whole.  DBNT acquiesced

in and is poised to imminently accept an unreasonably low settlement with Countrywide and

Bank of America on the Trust's behalf, releasing the Trust's valuable claims against

Countrywide and Bank of America in exchange for grossly inadequate compensation.  No

fiduciary would have taken these actions.

103.    DBNT's breach of its fiduciary duty in accepting a plainly inadequate

settlement will directly and proximately cause damage to Ambac by depriving the Trust of

valuable claims and remedies, and by squandering hundreds of millions of dollars in Trust assets,

which would otherwise benefit Ambac by reimbursing it for past draws on the Policy and by

creating a greater collateral cushion to reduce future draws on the Policy.

<strong>JURY DEMAND</strong>

104.    Ambac demands a trial by jury pursuant to Federal Rule of Civil

Procedure 38 and the Seventh Amendment to the United States Constitution.

<strong>PRAYER FOR RELIEF</strong>

**WHEREFORE**, Ambac respectfully prays for the following relief:

A.    A declaration that (i) an Event of Default occurred under the PSA, (ii) such Event

of Default has continued to the present, and (iii) DBNT and its Responsible

Officers have actual knowledge of the occurrence and continuance of such Event

of Default.

B.    An award of all appropriate damages in favor of Ambac and against DBNT for

damages sustained as a result of DBNT's breaches of contractual and common

law duties, in an amount to be determined at trial, including any applicable pre-

and post-judgment interest; and

C.    Any other relief that the Court deems just and proper.

36

10473281

Dated:      New York, New York
            August 16, 2018

PATTERSON BELKNAP WEBB & TYLER LLP

Peter W. Tomlinson
Stephanie Teplin
David Kleban
1133 Avenue of the Americas
New York, New York 10036-6710
Telephone:  (212) 336-2000
Fax:  (212) 336-2222
pwtomlinson@pbwt.com
steplin@pbwt.com
dkleban@pbwt.com

*Attorneys for Plaintiff Ambac Assurance
Corporation*

10473281